# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

KOHLER CO.,

                     **Plaintiff,**

        **v.**                                   **Case No. 20-CV-1563**

WHISTLING OAK APARTMENTS LLC,

                     **Defendant.**

---

# DECISION AND ORDER

---

## 1. Background

For over 20 years, Kohler Co. has been using "Whistling Straits" in commerce in conjunction with its Whistling Straits golf venue. (ECF No. 1, ¶ 15.) It is the registered owner of three trademarks containing the words "Whistling Straits." (ECF No. 1, ¶ 16.)

The Whistling Straits venue includes The Straits at Whistling Straits, a world-renowned golf course in Sheboygan County, Wisconsin that is generally ranked among the top ten public courses in the United States and regarded as the best course in Wisconsin. (ECF No. 1, ¶ 13; ECF No. 48 at 8[1].) It has hosted prestigious competitions,

---

[1] All citations reflect the ECF pagination.

including the PGA Championship three times and the U.S. Senior Open once, and it is scheduled to host the Ryder Cup in September 2021. (ECF No. 1, ¶ 14.)

Kohler also operates a Hospitality & Real Estate Group that includes luxury hotels and restaurants in Wisconsin and Scotland. (ECF No. 1, ¶¶ 10-11.) In Sheboygan County these include the American Club, the only Forbes Five-Star resort hotel in the Midwest, and the Inn on Woodlake. (ECF No. 1, ¶ 10.) The American Club includes a premier spa and multiple high-end dining establishments. (ECF No. 1, ¶ 10.)

Whistling Oak Apartments LLC was registered with the Wisconsin Department of Financial Institutions on January 17, 2020. (ECF No. 1, ¶ 21.) It began using the name "Whistling Oak" publicly in around May 2020 in connection with its development of an apartment complex in the Town of Sheboygan, Wisconsin. (ECF No. 1, ¶ 21.) The apartment complex is less than six miles from Whistling Straits. (ECF No. 51, ¶ 14.)

Kohler alleges that the Whistling Oak name infringes on its "Whistling Straits" mark. On October 9, 2020, it filed a complaint alleging trademark infringement under 15 U.S.C. § 1114 (ECF No. 1, ¶¶ 25-31 (count one)); unfair competition and false designation of origin under 15 U.S.C. § 1125(a) (ECF No. 1, ¶¶ 32-39 (count two)); trademark dilution under 15 U.S.C. § 1125(c) (ECF No. 1, ¶¶ 40-47 (count three)); and common law trademark infringement and unfair competition (ECF No. 1, ¶¶ 48-52 (count four)).

The parties agreed to hold off on other scheduling while they pursued mediation. (ECF Nos. 45, 46.) On May 14, 2021, however, Kohler moved for a preliminary injunction. (ECF No. 47.) It argues that, notwithstanding the parties' intention to pursue resolution through mediation, a preliminary injunction is now necessitated by the defendant's decision to use the Whistling Oak name in its advertising of the apartment complex and plan to begin leasing apartments on July 1, 2021. (ECF No. 48 at 6.)

## 2. Applicable Law

"A preliminary injunction is 'an exercise of a very far-reaching power, never to be indulged in except in a case clearly demanding it.'" *Cassell v. Snyders*, 990 F.3d 539, 544 (7th Cir. 2021) (quoting *Orr v. Shicker*, 953 F.3d 490, 501 (7th Cir. 2020)); *see also Winter v. NRDC, Inc.*, 555 U.S. 7, 24 (2008) ("A preliminary injunction is an extraordinary remedy never awarded as of right."); *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) ("a preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, *by a clear showing*, carries the burden of persuasion" (emphasis in original) (quoting 11A C. Wright, A. Miller, & M. Kane, Federal Practice and Procedure § 2948, pp. 129-130 (2d ed. 1995)).

The court's assessment of whether to grant a preliminary injunction proceeds in two phases. "As a threshold matter, a party seeking a preliminary injunction must demonstrate (1) some likelihood of succeeding on the merits, and (2) that it has 'no

adequate remedy at law' and will suffer 'irreparable harm' if preliminary relief is denied." *Cassell*, 990 F.3d at 544-45 (quoting *Abbott Labs. v. Mead Johnson & Co.*, 971 F.2d 6, 11 (7th Cir. 1992)). "If the court determines that the moving party has failed to demonstrate any one of these three threshold requirements, it must deny the injunction." *Girl Scouts of Manitou Council, Inc. v. Girl Scouts of the United States of Am. Inc.*, 549 F.3d 1079, 1086 (7th Cir. 2008).

The second phase is the balancing phase. *Cassell*, 990 F.3d at 545 (quoting *Girl Scouts*, 549 F.3d at 1086). "[T]he court, in an attempt to minimize the cost of potential error, 'must somehow balance the nature and degree of the plaintiff's injury, the likelihood of prevailing at trial, the possible injury to the defendant if the injunction is granted, and the wild card that is the public interest.'" *Girl Scouts*, 549 F.3d at 1086 (internal citation and quotation marks omitted) (quoting *Lawson Prods., Inc. v. Avnet, Inc.*, 782 F.2d 1429, 1433 (7th Cir. 1986)).

The court applies a sliding scale approach to weigh the movant's irreparable harm against the harm to the non-movant if the injunction were granted. *Girl Scouts*, 549 F.3d at 1086. "The more likely the plaintiff is to win, the less heavily need the balance of harms weigh in his favor; the less likely he is to win, the more need it weigh in his favor." *Id.* (quoting *Roland Mach. Co. v. Dresser Indus., Inc.*, 749 F.2d 380, 387 (7th Cir. 1984)). The court should also consider the effect of an injunction on non-parties, *i.e.*, on the public. *Id.*

"Taking into account all these considerations, the district court must exercise its discretion 'to arrive at a decision based on a subjective evaluation of the import of the various factors and a personal, intuitive sense about the nature of the case.'" *Girl Scouts*, 549 F.3d at 1086 (quoting *Lawson Prods.*, 782 F.2d at 1436).

## 3. Analysis

In the context of a claim regarding a trademark, "the movant shows a likelihood of success by establishing that 1) he has a protectable mark, and 2) that a 'likelihood of confusion' exists between the marks or products of the parties." *Meridian Mut. Ins. Co. v. Meridian Ins. Grp., Inc.*, 128 F.3d 1111, 1115 (7th Cir. 1997). In assessing whether consumers are likely to be confused, the court assesses seven factors: "(1) the similarity between the marks in appearance and suggestion; (2) the similarity of the products; (3) the area and manner of concurrent use; (4) the degree and care likely to be exercised by consumers; (5) the strength of the plaintiff's mark; (6) any actual confusion; and (7) the intent of the defendant to 'palm off' his product as that of another." *Autozone, Inc. v. Strick*, 543 F.3d 923, 929 (7th Cir. 2008).

"Injuries arising from trademark infringement are presumed irreparable because the plaintiff's reputation is being imperiled by the acts of another." *Starsurgical Inc. v. Aperta, LLC*, No. 10-CV-01156, 2011 U.S. Dist. LEXIS 141545, at *8 (E.D. Wis. Dec. 8, 2011) (citing *Re/Max North Cent., Inc. v. Cook*, 272 F.3d 424, 432 (7th Cir. 2001)); *see also A&F Enters., Inc. II v. IHOP Franchising LLC (In re A&F Enters., Inc. II)*, 742 F.3d 763, 769 (7th

Cir. 2014) ("we have frequently said that trademark violations are irreparable, primarily because injuries to reputation and goodwill are nearly impossible to measure"); *AM Gen. Corp. v. Daimlerchrysler Corp.*, 311 F.3d 796, 805 (7th Cir. 2002) (there is a "presumption that trademark dilution or infringement threatens irreparable injury for which there is no adequate remedy at law").

### 3.1. First Phase—Likelihood of Success, Irreparable Harm, and Inadequacy of Remedy at Law

Whistling Oak does not dispute that Kohler has a protectable mark. It does, however, dispute whether a likelihood of confusion exists. Thus, the court assesses the seven factors relevant to determining whether a likelihood of confusion exists.

#### 3.1.1. Similarity of the Marks

There are no allegations of visual similarity between the "Whistling Straits" mark and the "Whistling Oak" mark. *Cf. Autozone*, 543 F.3d at 930. Nor is there any allegation of aural similarity between the two marks. *See Barbecue Marx, Inc. v. 551 Ogden, Inc.*, 235 F.3d 1041, 1044 (7th Cir. 2000). The alleged similarity is strictly in the use of a two-word phrase with "Whistling" as the first word to modify a noun as the second word. Kohler argues that "Whistling" is the salient part of its mark. (ECF No. 48 at 23-24); *see Meridian Mut. Ins. Co.*, 128 F.3d at 1115 ("In comparing two marks to determine whether they are confusingly similar, this Circuit follows the rule that 'if one word or feature of a composite trademark is the salient portion of the mark, it may be given greater weight

than the surrounding elements.'" (quoting *Int'l Kennel Club of Chi., Inc. v. Mighty Star, Inc.*, 846 F.2d 1079, 1088 (7th Cir. 1988))).

"[T]he test is not whether the public would confuse the *marks*, but whether the viewer of an accused mark would be likely to associate the product or service with which it is connected with the source of products or services with which an earlier mark is connected." *Autozone,* 543 F.3d at 930 (emphasis in original) (quoting *James Burrough Ltd. v. Sign of Beefeater, Inc.*, 540 F.2d 266, 275 (7th Cir. 1976)). "The court should therefore 'consider whether the customer would believe that the trademark owner sponsored, endorsed or was otherwise affiliated with the product.'" *Id.* (quoting *Nike, Inc. v. "Just Did It" Enters.*, 6 F.3d 1225, 1228-29 (7th Cir. 1993)); *see also Sands, Taylor & Wood Co. v. Quaker Oats Co.*, 978 F.2d 947, 958 (7th Cir. 1992) ("Modern trademark law prohibits use of a senior user's mark not only on products that are in direct competition with those of the senior user but also on products that are considered to be closely related to the senior user's. A closely related product is one which would reasonably be thought by the buying public to come from the same source, or thought to be affiliated with, connected with, or sponsored by, the trademark owner." (internal citations and quotation marks omitted)).

Viewed in this light, a similarity exists between the marks when assessed in their entirety. If Whistling Straits were to open an apartment complex at the site of the Whistling Oak complex, "Whistling Oak" would be a reasonable choice for its name. It

would maintain the "Whistling" brand identity. But because the complex is not near water, a marine term like "Straits" would be out of place, and thus the substitution of a terrestrial term like "Oak" would be logical.

Thus, on balance, the similarity of the marks tends to modestly support a finding of a likelihood of confusion.

### 3.1.2. Similarity of Products

Whistling Straits is primarily a golf venue, and its mark is registered for use in relation to a golf course, golf club services, golf equipment, luggage, and clothing. (ECF No. 1-1 at 3-4.) Whistling Oak is an apartment complex. On the surface, the "products" are dissimilar.

But "[t]he rights of an owner of a registered trademark extend to any goods or services that, in the minds of consumers, might be put out by a single producer." *Autozone*, 543 F.3d at 931. In this regard, Kohler regularly packages golf at Whistling Straits with accommodations at other nearby Kohler properties to provide complete travel packages to golfers. (ECF No. 48 at 9.) Thus, while Kohler is not currently involved in the residential housing market, its Whistling Straits mark is used in conjunction with temporary housing accommodations.

Kohler argues that the Whistling Oak apartments are "at least complementary" to the goods and services Kohler offers under its Whistling Straits marks. (ECF No. 48 at 28.) Notably, Kohler previously explored the prospect of developing condominiums

associated with the Whistling Straits marks, which it intended to market as the "Cottages at Whistling Straits." (ECF No. 48 at 27-28.) While its prior plans do not support the issuance of a preliminary injunction as would imminent plans to enter the housing market, *Sands, Taylor & Wood Co.*, 978 F.2d at 958 ("When it appears extremely likely … that the trademark owner will soon enter the defendant's field, this … factor weighs heavily in favor of injunctive relief." (quoting *Interpace Corp. v. Lapp, Inc.*, 721 F.2d 460, 464 (3d Cir. 1983)), the plans tend to support its assertion that golf and housing are complementary "products."

Moreover, golf courses often are connected to or part of housing communities. Although Whistling Oak is not directly adjacent to Whistling Straits, proximity to a golf course is a commonly advertised amenity for housing, including in Whistling Oak's own advertisements (ECF No. 51-6 at 11) (although it is unclear if that information was posted by Whistling Oak or included by Apartments.com as general information about Sheboygan). Apartment complexes and golf courses are similarly land-intensive developments, and a reasonable consumer could believe that a golf venue (Whistling Straits) had developed an apartment complex (Whistling Oak) in the same relatively small community. *See Autozone*, 543 F.3d at 931; *see also CAE, Inc. v. Clean Air Eng'g, Inc.*, 267 F.3d 660, 681 (7th Cir. 2001) ("Courts have recognized that an important reason to protect trademark owners against the use of similar marks on closely related products is "to protect the owner's ability to enter product markets in which it does not now trade

but into which it might reasonably be expected to expand in the future.'" (quoting *Sands, Taylor & Wood Co.*, 978 F.2d at 958)).

Whistling Oak notes that residences in the Sheboygan area are often offered as short-term rentals for vacationers, and these advertisements sometimes explicitly refer to Whistling Straits. (ECF No. 75 at 20.) Kohler states that it is "actively pursuing" this allegedly infringing use of its mark. (ECF No. 77 at 8.) Although Whistling Oak states that it does not offer short-term rentals (ECF No. 75 at 15), it conceivably could do so in the future, or its individual tenants[2] may choose to do so. Particularly during high profile national and international events where thousands of visitors come to Whistling Straits, it is certainly plausible that the Whistling Oak name will be used in conjunction with advertisements targeting persons visiting Whistling Straits.

Overall, this factor also tends to modestly weigh in favor of finding a likelihood of confusion.

### 3.1.3. Manner and Area of Concurrent Use

"The third factor in the likelihood of confusion analysis assesses whether there is a relationship in use, promotion, distribution, or sales between the goods or services of the parties." *Autozone,* 543 F.3d at 932 (quoting *CAE,* 267 F.3d at 681) (internal quotation marks omitted).

---

[2] Whistling Oak's standard lease agreement bars such sub-leases (ECF No. 63-6 at 5), but even if forbidden, it cannot be guaranteed that Whistling Oak would enforce such a prohibition, would not allow such uses in the future, or might not itself put un-leased apartments to such use.

With respect to the manner of use, Whistling Oak asserts that it has "taken great care to identify the property as 'Whistling Oak Apartments' whenever possible, and the name is almost always accompanied by the phrase 'a Wisconsin Lakefront Property Management development.'" (ECF No. 75 at 11.) Although certain of these modifications occurred only after Kohler filed its present motion (ECF No. 77 at 9-10), for present purposes the court is concerned only with the likelihood of confusion going forward. The addition of "Apartments" emphasizes that there is a lack of competition between Whistling Oak and Whistling Straits, but it is not as if there was reason to suspect that the public would think Whistling Oak was anything other than apartments. However, a clear reference to the complex as being a "Wisconsin Lakefront Property Management development" would seemingly mitigate any confusion.

As to the area of concurrent use, Whistling Straits and Whistling Oak are both located in Sheboygan, Wisconsin. Both parties emphasize that Whistling Straits and Whistling Oak are within six miles of each other. Naturally, Whistling Oak suggests that six miles is worlds away from Whistling Straits, while Whistling Straits suggests that six miles puts Whistling Oak practically in its backyard.

As Whistling Oak notes, other entities in Wisconsin use a "Whistling [noun]" name, some of which are associated with residential establishments, including a subdivision and an assisted living facility, as well as a bed and breakfast. (ECF No. 75 at 17-19.) However, none is in or near Sheboygan. Sheboygan is a small city with a

population of less than 50,000; the entire county has only about 115,000 people. In this context, six miles is a short distance. *Cf. Barbecue Marx*, 235 F.3d at 1045 (finding 1.4 miles between two restaurants is "quite a distance" in the context of densely populated Chicago neighborhoods "crowded with dozens of restaurants"). Significant in this regard is the fact that one of the signs that Kohler posted around the community to aid drivers in locating Whistling Straits is about 1,000 yards from Whistling Oak.[3] Given that a "Whistling [noun]" name is uncommon, the fact that two entities are using it in the same small community creates a greater risk of confusion.

In short, the manner in which Whistling Oak is currently using its mark, identifying the complex as being a "Wisconsin Lakefront Property Management development," would seemingly mitigate any confusion. However, it doesn't always use the mark with this additional information. And the fact that the Whistling Oak name is being used in an area so near Whistling Straits increases the likelihood of confusion. Overall, this factor weighs in favor of finding a likelihood of confusion.

---

[3] Kohler asserts that the sign "is across the street from the apartment complex." (ECF No. 48 at 11; *see also* ECF No. 77 at 11 ("One of Kohler's WHISTLING STRAITS directional signs is located *across the street* from WOA's apartments." (emphasis in original)).) According to the map Kohler provided, that is not accurate, at least not as "across the street" is commonly understood. Whistling Oak is located to the east of Wisconsin Highway 42. The sign is located on County Road Y, which is the next road to the west of Highway 42. Between 42 and Y is a large commercial building.

### 3.1.4. Degree of Care Likely to be Exercised by Consumers

"The more widely accessible and inexpensive the products and services, the more likely that consumers will exercise a lesser degree of care and discrimination in their purchases." *CAE,* 267 F.3d at 683.

Renting an apartment is not an impulse decision. Nor is it a decision a person usually intends to make often. Therefore, a renter is likely to exercise significant care in choosing a place to live. But the care exercised is likely to be focused on things like cost, location, amenities, and features. Prospective renters are less likely to closely investigate who owns an apartment complex. In this regard, it is plausible that a person may rent an apartment at Whistling Oak under the mistaken belief that the complex is affiliated with Whistling Straits, and thus have a favorable opinion of the complex based on its perceived association with that luxury brand.

Similarly, a person seeking to golf at a top-tier golf venue is likely to exhibit significant care. But, again, a prospective golfer's care is likely to focus on things like cost, location, amenities, and features, and not whether the venue is associated with middle-income apartments.

Overall, this factor does not suggest a likelihood of confusion.

### 3.1.5. Strength of Plaintiff's Mark

"The 'strength' of a trademark refers to the mark's distinctiveness, meaning its propensity to identify the products or services sold as emanating from a particular

source." *CAE,* 267 F.3d at 684. "Trademark law recognizes five categories of trademarks, in ascending order of distinctiveness: generic, descriptive, suggestive, arbitrary and fanciful." *Id*.

Kohler asserts that its mark is arbitrary. (ECF No. 48 at 25 (quoting 2 McCarthy on Trademarks and Unfair Competition § 11:11 (5th ed.) ("Arbitrary word marks are words in common linguistic use but which, when used with the goods or services in issue, neither suggest nor describe any ingredient, quality or characteristic of those goods or services."); *Am. Eagle Outfitters, Inc. v. Am. Eagle Furniture, Inc.*, 11 C 02242, U.S. Dist. LEXIS 180912, at *22-23 (N.D. Ill. Dec. 27, 2013) ("'American Eagle,' the most salient part of the mark, is an arbitrary mark because 'it neither describes nor suggests [the trademark owner's] product or service'")).) Whistling Oak does not argue otherwise. Thus, in terms of distinctiveness, the Whistling Straits mark is very strong.

As Whistling Oak notes, Kohler's use of "Whistling" is uncommon but not unique. Other businesses organized in Wisconsin use the word "Whistling" followed by an arboreal or terrestrial noun, such as Arbors, Hill, Pines, or Valley. (ECF No. 75 at 17.) But this sort of evidence "is not particularly informative or persuasive as to the probable impact of such uses" because a simple list ignores the extent of Kohler's use of its mark. *See* 2 McCarthy on Trademarks and Unfair Competition § 11:88 (5th ed.).

The strength of a mark also tends to correspond with its economic and marketing strength. *Autozone,* 543 F.3d at 933. In this regard as well, as Whistling Oak concedes

(ECF No. 75 at 15), Whistling Straits is very strong, at least when it comes to golf. Whistling Straits is not just a local golf course but a world-renowned, top-tier golf venue that has hosted the PGA Championship multiple times and is scheduled to host the Ryder Cup later this year. In this regard, it has very strong economic and marketing strength.

In the Sheboygan community the mark is undoubtedly even stronger. Kohler accurately asserts that the "Whistling Straits venue … is one of the most prominent, distinctive, and well-known businesses in Sheboygan County – to golfers and non-golfers alike." (ECF No. 48 at 26.) There is not likely any attraction in the community with greater notoriety or prestige.

This factor weighs strongly on Kohler's side.

### 3.1.6. Actual Confusion

"Although evidence of actual confusion, if available, is entitled to substantial weight in the likelihood of confusion analysis, this evidence is not required to prove that a likelihood of confusion exists." *CAE*, 267 F.3d at 685 (internal citations omitted).

No evidence has been presented of any consumer having been confused by the similarity of the marks, *e.g.*, a prospective renter expressing a belief that Whistling Oak was associated with Whistling Straits. Having said that, Whistling Oak has started using the name in communications with the general public only very recently.

Kohler points to an online survey conducted by a consumer psychology expert which found a 55 percent rate of confusion among consumers. (ECF No. 48 at 17-23.) Whistling Oak criticizes the survey as merely "a word comparison" rather than "a realistic assessment of how any real consumers of either plaintiff or defendant's goods and services would be confused." (ECF No. 75 at 1-2.)

The court agrees that the survey is of little probative value at this stage because it reveals only what is intuitive—that, when presented with entity names using overlapping words, some people may presume a relationship between the entities exists. *Cf. Kraft Foods Grp. Brands LLC v. Cracker Barrel Old Country Store, Inc.*, 735 F.3d 735, 741-43 (7th Cir. 2013) (discussing surveys in the context of trademark litigation).

It is unnecessary to further discuss the purported flaws Whistling Oak identified in the survey because the strength or weakness of the survey does not affect the outcome of this decision. Nor is it necessary to discuss the declaration of Whistling Oak's expert. (ECF No. 80-1.) For present purposes the court will accept that there has not been any instance of an actual consumer, of either Whistling Oak or Whistling Straits, having been confused.

Thus, this factor favors Whistling Oak, albeit weakly given that it has only recently begun broadly using the mark. *See Barbecue Marx*, 235 F.3d at 1045-46 ("Because BONE DADDY has not yet opened its doors, it would be exceedingly difficult for

Barbecue Marx to find evidence of actual confusion."); *see also CAE*, 267 F.3d at 686 (noting "a twenty-five-year history without reported incidents of actual confusion").

### 3.1.7.   Intent of the Defendant

"[T]he defendant's intent is relevant to the issue of likelihood of confusion only if he intended 'to palm off his products as those of another,' thereby profiting from confusion." *Sands, Taylor & Wood Co.*, 978 F.2d at 961. Whistling Oak presents evidence that its name arose independent of and without consideration of Whistling Straits. Accepting these representations as true, Whistling Oak did not consciously intend to palm off its new apartment complex as being associated with Whistling Straits. At least not initially.

But a reasonable finder of fact could nonetheless ascribe bad faith to Whistling Oak in light of its refusal to change the name in the face of Kohler's objections. When Kohler first objected to the Whistling Oak name, Whistling Oak appears to have had very little invested in the name, monetarily or otherwise. There is no evidence that there is any established goodwill in the name, *e.g.*, evidence that Whistling Oak operates other apartment complexes using the same name.

According to Whistling Oak, the name was chosen simply because the property is frequently windy and has a large oak tree on it. Given those criteria, a long list of alternative names could have been used for the development. Or to draw upon the goodwill of Wisconsin Lakefront Property Management's adjacent complex, Windward

Cove, Whistling Oak could have still maintained references to wind and the oak tree by simply calling the new complex Windward Oak (presuming, of course, that such a name would not interfere with the trademark rights of any other entity). Despite countless other options, Whistling Oak has refused to change the name.

Even if changing the name will cause Whistling Oak to incur some modest costs, those costs would appear insignificant when balanced against the cost of litigation. Thus, an inference is that Whistling Oak must see value in the name greater than the significant cost of litigation. Given that its monetary investment in the name was likely relatively minimal when this dispute arose, a jury could conclude from its intransigence that it now recognizes the value of potentially riding on the coattails of the Whistling Straits mark.

But, of course, the court recognizes that sometimes litigants prefer Pyrrhic litigation rather than giving in to what they perceive as bullying by a big corporation. Given that prospect, the court will not ascribe any ill motive to Whistling Oak.

Therefore, the court does not regard this factor as weighing in favor of a likelihood of confusion.

### 3.1.8. Weighing the Seven Factors

"The likelihood of confusion test is an equitable balancing test." *Barbecue Marx*, 235 F.3d at 1044. The weight afforded any factor will vary among cases, but no factor is entitled to dispositive weight. *Id*.

Weighing most strongly in favor of a finding that a likelihood of confusion exists is the proximity between Whistling Straits and Whistling Oak. In the small community of Sheboygan, six miles is a short distance. The Whistling Straits mark is strong, and especially so in the Sheboygan community.

The remaining factors are of middling weight, sometimes cutting both ways. No evidence has been presented suggesting that Whistling Oak is intentionally trying to take advantage of the goodwill in the Whistling Straits name. Kohler's survey evidence of confusion suggests only what is intuitive—that some people will assume that similarly named entities are related. But such an assessment does not take into consideration the real-world circumstances in which consumers are likely to encounter the Whistling Straits and Whistling Oak marks. Whistling Oak's identification of its property as being "a Wisconsin Lakefront Property Management development" could address any likelihood of confusion if Whistling Oak always so identified the property. And although no evidence of actual confusion has been presented, Whistling Oak has only recently begun its efforts to publicize its name.

The "products" are dissimilar but arguably complementary. Thus, a consumer exposed to both marks could reasonably believe that Whistling Straits opened an apartment complex and, in doing so, continued its use of the "Whistling" name, but changed "Straits" to "Oak" to more accurately reflect its inland location. In this regard, the marks are similar. But the marks are not otherwise aurally or visually similar.

If the Whistling Oak mark were used in conjunction with short-term rentals, the risk of confusion would be significantly greater. Although such a use is a possibility, there is no evidence that such use is likely during the pendency of this case so as to necessitate the issuance of a preliminary injunction.

Ultimately, the court is mindful that Kohler's burden is only to demonstrate that it has a "greater than negligible chance of prevailing on the merits." *Barbecue Marx*, 235 F.3d at 1043. Kohler has cleared this low bar and the court's analysis must continue.

### 3.1.9. Lack of an Adequate Remedy at Law and Irreparable Harm

Kohler is "entitled to a rebuttable presumption of irreparable harm …" if it can show a better than negligible chance of success on the merits. 15 U.S.C. § 1116(a); *see also Eli Lilly & Co. v. Nat. Answers, Inc.*, 233 F.3d 456, 469 (7th Cir. 2000) ("Irreparable harm is generally presumed in cases of trademark infringement and dilution."); *Starsurgical*, 2011 U.S. Dist. LEXIS 141545, at *8 (citing *Re/Max North Cent.*, 272 F.3d at 432). Because Kohler has demonstrated a greater than negligible chance of prevailing on the merits, it is entitled to a presumption of irreparable harm.

A delay in seeking a preliminary injunction may serve to rebut the presumption of irreparable harm. *Redbox Automated Retail, LLC v. Xpress Retail LLC*, 310 F. Supp. 3d 949, 952 (N.D. Ill. 2018) (holding that presumption of irreparable harm was rebutted when plaintiff delayed 18 months after learning of defendant's allegedly infringing conduct before filing suit and seeking a preliminary injunction) (citing, in part, *Ty, Inc. v.*

*Jones Grp., Inc.*, 237 F.3d 891, 903 (7th Cir. 2001)). However, Kohler, did not delay. Given that Whistling Oak had generally not yet begun broadly using its name publicly, Kohler reasonably opted to first attempt to resolve the parties' dispute rather than immediately seeking a preliminary injunction. Only when Whistling Oak began advertising its apartments using the Whistling Oak mark did Kohler pursue a preliminary injunction. To hold that this reasonable course of action rebuts the presumption of irreparable harm would force plaintiffs to pursue potentially unnecessary motions when simpler and less-costly alternatives may promptly resolve the dispute.

In its attempt to rebut the presumption Whistling Oak argues that it "has produced evidence (absence of actual confusion, totally different products, disparate channels of trade, different classes of consumers, extreme care exercised by consumers with respect to both parties' products, etc.) that demonstrates that Kohler will not suffer any harm." (ECF No. 75 at 50.) In addition, it notes that Kohler refused to answer nearly all of its discovery requests aimed at determining in what way Kohler would be harmed by the use of the Whistling Oak name for apartments. (ECF No. 75 at 44-47.) In short, Kohler has not articulated any specific irreparable harm it is likely to suffer. According to Whistling Oak, this confirms that "Kohler has not and will not suffer any irreparable harm by virtue of Whistling Oak's use of its name." (ECF No. 75 at 50.)

Whistling Oak's argument, in part, rests on what seems to be a conflation of the likelihood of confusion and irreparable harm elements. In effect, Whistling Oak is

arguing that Kohler is not likely to suffer any irreparable harm because it is not going to win. But that ignores that the statutory presumption of irreparable harm is triggered upon a finding that Kohler has shown a better than negligible chance of success on the merits. Simply rehashing arguments regarding the plaintiff's likelihood of success cannot serve to rebut the presumption. Of course, some of those arguments are relevant when balancing the parties' respective harms, below.

Whistling Oak's second argument is essentially that Kohler itself has rebutted the presumption by refusing to respond to discovery requests aimed at determining how it would be harmed.

Kohler did not literally fail to respond. It responded, but it offered nothing more than the rationale for the presumption. It said:

> When a trademark is infringed or diluted, it necessarily no longer serves as a unique identifier, and in this case, to the extent that potential or actual consumers are misled or otherwise confused, the goodwill that the trademark owner has developed in its infringed and/or diluted marks will necessarily suffer. This includes situations in which a potential or actual consumer is not confused after further engaging with the infringer but where there is initial interest confusion.

(ECF No. 67-15 at 70.)

Kohler's failure to be more specific tends to reinforce why courts and subsequently Congress created the presumption, *see generally* H.R. Rep. No. 116-645 at 16-20 (2020)—"It is often next to impossible to prove such evanescent injury at the preliminary injunction stage. Consumer confusion, particularly that generated by

intentional infringement, would doubtlessly erode market share to an unquantifiable degree," *id.* at 16, fn. 36 (quoting Anne Gilson LaLonde & Jerome Gilson, Adios! To the Irreparable Harm Presumption in Trademark Law, 107 Trademark Rep. 913, 921 (2017)).

Thus, the court must conclude that Whistling Oak has failed to rebut the presumption that Kohler will suffer irreparable harm in the absence of a preliminary injunction. However, it is important to note that a conclusion at this stage of the analysis that the harm is irreparable is not a finding that the harm is substantial. The degree of harm is discussed below in the second phase of the preliminary injunction analysis.

As for the inadequacy of any remedy at law, Whistling Oak's response is simply to assert that Kohler "has not shown or explained how or why the remedies of recovery of (1) defendant's profits, (2) any damages sustained by the plaintiff, (3) costs of the action, and other remedies provided under 15 U.S.C. §1117 and other provision of the Lanham Act are inadequate." (ECF No. 75 at 50.)

As Kohler notes, however, damages are often a poor means of redressing the harm caused by trademark infringement. (ECF No. 48 at 31 (citing *Hyatt Corp. v. Hyatt Legal Servs.*, 736 F.2d 1153, 1158-59 (7th Cir. 1984) ("We conclude that the difficulty Hyatt Hotels would encounter in proving damages incurred because of Hyatt Legal Services' dilution of its mark and the nature of the injury direct a finding of irreparable injury."); *Int'l Kennel Club of Chi.*, 846 F.2d at 1092 ("More importantly, this court has: 'often recognized that the damages occasioned by trademark infringement are by their very

nature irreparable and not susceptible of adequate measurement for remedy at law.'" (quoting *Processed Plastic Co. v. Warner Communs., Inc.*, 675 F.2d 852, 858 (7th Cir. 1982))).)

If Kohler prevails at trial, any reputational damage it has suffered by virtue of Whistling Oak's use of the mark during the pendency of this case will be difficult to quantify. Therefore, Kohler has adequately demonstrated that it lacks adequate legal remedies to address its presumed irreparable harm. *See Reverse Mortg. Sols., Inc. v. Reverse Mortg. Sols., Inc.*, No. 15 C 9182, 2015 U.S. Dist. LEXIS 172580, at *19 (N.D. Ill. Dec. 29, 2015) ("In some cases, this presumption has been enough to determine the plaintiff has no adequate remedy and will suffer irreparable harm.") (citing *Lettuce Entertain You Enterprises, Inc. v. Leila Sophia AR, LLC*, 703 F. Supp. 2d 777, 790 (N.D. Ill. 2010)).

### 3.2. Second Phase

Kohler having sustained its burden to show that it "had a better than negligible chance of showing a likelihood of confusion," *Ty*, 237 F.3d at 896, the absence of an adequate remedy at law, and the presumption of irreparable harm, the court must move to the second phase of the preliminary injunction inquiry. In this phase the court must balance (1) the harm to the defendant if the injunction were granted; (2) the harm to plaintiff if the injunction were denied; (3) and the public interest, *id.* at 895. The court weighs these factors using a "sliding scale approach; the more likely the plaintiff will

succeed on the merits, the less the balance of irreparable harms need favor the plaintiff's position." *Id.* "The sliding scale approach is not mathematical in nature, rather 'it is more properly characterized as subjective and intuitive, one which permits district courts to weigh the competing considerations and mold appropriate relief.'" *Id.* at 895-96 (quoting *Abbott Labs*, 971 F.2d at 12).

### 3.2.1. Injury to the Defendant

Whistling Oak's principal, Eileen Robarge, asserts that granting a preliminary injunction "would be very disruptive and detrimental ...." (ECF No. 75 at 51; *see also* ECF No. 63, ¶¶ 19-28.) She asserts that an injunction will disrupt her relationship with local governments and vendors, damage her relationship with the bank providing financing for the Whistling Oak development, injure her personal and business reputations, disrupt advertising, interfere with relationships and contracts with vendors, and cause Whistling Oak to potentially lose tenants. (ECF No. 75 at 51.)

Few of these harms are remotely likely, and the fact that Whistling Oak is forced to resort to such far-fetched propositions just underscores the likely minimal injury to it if a preliminary injunction were granted. Certain of Whistling Oak's arguments seem to be based on a misunderstanding of the nature of the preliminary injunction that Kohler seeks. Kohler is not asking Whistling Oak to change its name. (ECF No. 77 at 18.) Rather, it is seeking only to bar Whistling Oak from publicly using the Whistling Oak mark. It may continue to exist legally as "Whistling Oak Apartments LLC" and to use

that term on contracts and similar formal documents; Kohler seeks only that it publicly does its business under some other name.

But even if the court were to regard Robarge's speculative harms as plausible, they were foreseeable risks that Robarge chose to take. As Kohler notes, a business owner who adopts a mark without due diligence and then refuses to change it in the face of an objection cannot then defeat a subsequent motion for a preliminary injunction on the ground that changing it has become too expensive. (ECF No. 77 at 19-20 (citing *USA-Halal Chamber of Commerce, Inc. v. Best Choice Meats, Inc.*, 402 F. Supp. 3d 427, 440 (N.D. Ill. 2019); *Nat'l Fin. Partners Corp. v. Paycom Software, Inc.*, No. 14 C 7424, 2015 U.S. Dist. LEXIS 74700, at *49 (N.D. Ill. June 10, 2015); *Lettuce Entertain You*, 703 F. Supp. 2d at 790-91).)

If a preliminary injunction were to be issued, Whistling Oak likely would need to reprint brochures, rental applications, and leases omitting the Whistling Oak mark. It would be necessary to remove, modify, or replace a sign outside its development. (ECF No. 63-4 at 2.) Whistling Oak provided a photograph of this sign, which appears to be the sort of temporary plywood and signboard sign commonly seen outside new construction, perhaps two-and-a-half feet tall by six feet wide and supported by framing lumber. In other words, it likely can be replaced at minimal cost.

Whistling Oak also would need to update its website and its listings on third-party websites. Given that it already made these changes once to add "Apartments" to

its name after Kohler filed the present motion, additional changes would seemingly require minimal effort and cost.

Whistling Oak does not suggest a cost for these changes. In a web posting by Robarge, she asserts, "Now I am heavily invested into the name which will cost $10s of thousands to change …." (ECF No. 52-4.) However, given the hyperbolic tone of the posting and lack of any substantiation for such a figure, the court does not credit it. Altogether the costs would seem to be slight.

Moreover, a bond under Fed. R. Civ. P. 65(c) would protect Whistling Oak from injury from these costs. Underscoring the likely minimal nature of its potential expenses is the fact that Whistling Oak does not respond to Kohler's request that bond be waived or suggest an amount of any bond. However, the court recognizes that, if Whistling Oak were to prevail and thus resume using the Whistling Oak name, this whipsawing could cause some public confusion and a negligible loss of goodwill.

In sum, any potential injury to Whistling Oak should a preliminary injunction be issued would be minimal.

### 3.2.2. Nature and Degree of Plaintiff's Injury

The nature of Kohler's potential injuries appears to be strictly in the form of "damage to a trademark holder's goodwill." *Re/Max N. Cent.*, 272 F.3d at 432. "The most corrosive and irreparable harm attributable to trademark infringement is the inability of the victim to control the nature and quality of the defendant['s] goods. Even if the

infringer's products are of high quality, the plaintiff can properly insist that its reputation should not be imperiled by the acts of another." *Id.* (citing *Int'l Kennel Club of Chi.*, 846 F.2d at 1092). But this suggests only the nature of Kohler's presumed irreparable harm. It leaves unanswered the question of to what degree might Kohler be harmed.

As noted above, in response to Whistling Oak's discovery requests Kohler failed to articulate any harm it is likely to suffer during the pendency of this case if the court denies it a preliminary injunction. Although Kohler's reliance on the statutory presumption of harm was sufficient in phase one, the court's analysis in this phase is distinct.

In light of the unrebutted presumption, the court accepts that Kohler is likely to suffer an injury to its goodwill in the absence of a preliminary injunction. However, at this phase the court must assess "the *degree* of irreparable harm to the plaintiff …." *Incredible Techs., Inc. v. Virtual Techs., Inc.*, 400 F.3d 1007, 1011 (7th Cir. 2005) (emphasis added); *see also GB Elec., Inc. v. Thomas & Betts Corp.*, Civil Action No. 95-C-0426, 1995 U.S. Dist. LEXIS 20116, at *25 (E.D. Wis. July 28, 1995) ("Even presuming GB will suffer irreparable harm from an incorrectly denied preliminary injunction, GB must show the degree of harm.").

The degree of any injury to Kohler during the pendency of this lawsuit is likely to be minimal. As discussed above, Whistling Oak and Whistling Straits are not in direct

competition. They serve different clientele who are likely to exercise care in their relevant decision-making. While persons exposed to the Whistling Oak mark likely will be aware of Whistling Straits, Kohler has not shown that the persons most likely to patronize Whistling Straits are likely to encounter the Whistling Oak mark. The Whistling Oak mark is generally used locally, targeting middle-income Sheboygan-area renters. Kohler's Whistling Straits mark is used world-wide in conjunction with top-tier luxury golf. Kohler's injury likely would be more significant if the Whistling Oak mark were used in conjunction with short-term rentals targeting Whistling Straits' patrons, but no evidence has been presented that this is likely to occur during the pendency of this lawsuit.

### 3.2.3. Public Interest

Whistling Oak argues that the public interest favors "free and open competition." (ECF No. 75 at 52.) That is true, but incomplete. The public interest favors free, open, and *fair* competition. *See, e.g.*, *R.H. Donnelley Corp. v. Ill. Bell Tel. Co.*, 595 F. Supp. 1202, 1207 (N.D. Ill. 1984). It is fair competition that is fostered with a preliminary injunction if it prevents Whistling Oak from unfairly capitalizing on Whistling Straits' goodwill.

Arguing that "there is harm to the public beyond just fair competition," Whistling Oak notes that public agencies have touted the Whistling Oak project and prospective tenants have signed and will sign leases. (ECF No. 75 at 52.) But the argument is undeveloped and unclear. In any event, notwithstanding Robarge's

implausible speculation, a preliminary injunction will not stop the development. Any public investment in the project will not be negated.

As for prospective tenants, no evidence has been presented that the Whistling Oak name has any goodwill. Nor has any evidence been presented that, without the Whistling Oak name, lessees will seek to renege, or would-be tenants will look elsewhere. Such a scenario would occur only if Whistling Oak were riding on the coattails of Whistling Straits, in which case the public interest favors granting a preliminary injunction to avoid such confusion.

On balance, the court finds that the public interest slightly favors granting a preliminary injunction given the risk that the public will be confused by the Whistling Oak mark. *See Entm't One UK Ltd. v. 2012shiliang*, 384 F. Supp. 3d 941, 955 (N.D. Ill. 2019) ("eliminating potential consumer confusion serves the public interest"); *see also USA-Halal Chamber of Commerce,* 402 F. Supp. 3d at 440-41; *Simpson Performance Prods. v. Wagoner*, 133 F. Supp. 3d 1130, 1138 (N.D. Ind. 2015) ("An injunction serves the public interest in this case 'because enforcement of the trademark laws prevents consumer confusion.'" (quoting *Eli Lilly*, 233 F.3d at 469).

### 3.3. Assessing all Relevant Factors

The present action shares similarities with *Barbecue Marx, Inc. v. 551 Ogden, Inc.*, 235 F.3d 1041 (7th Cir. 2000), in that that case also dealt with two-word names that shared a common term. At issue in *Barbecue Marx* was whether the defendant could

operate a barbecue restaurant using the name Bone Daddy when the plaintiff operated a barbecue restaurant 1.4 miles away under the name Smoke Daddy. The Seventh Circuit Court of Appeals held that the district court abused its discretion in granting the plaintiff a preliminary injunction.

The plaintiff's case in *Barbecue Marx* appears to have been significantly stronger than Kohler's here. The marks were used for restaurants selling the same product in direct competition with each other. Consumers are likely to exercise significantly less care in deciding which barbecue restaurant to eat at than they will in deciding where to live or golf. The Smoke Daddy mark was used in conjunction with an established and renowned restaurant that reasonably feared a loss of goodwill from the "irreverent" slogans associated with the Bone Daddy mark. Granted, *Barbecue Marx* is distinguishable in some respects, including the fact that the court found the distance between the restaurants significant given the crowded Chicago neighborhoods in which they were located. But if granting an injunction there was an abuse of discretion, it is hard to see how granting an injunction here would be appropriate.

Although the court has found that Kohler's likelihood of success on its infringement claim is greater than negligible, it may not be much more than that. *See Barbecue Marx*, 235 F.3d at 1046 (holding that barbecue restaurant owner operating under the name Smoke Daddy did not have a greater than negligible chance of success in prevailing against barbecue restaurant operating 1.4 miles away under the name

Bone Daddy). Thus, to grant its motion and award it the extraordinary relief of a preliminary injunction, the sliding scale analysis would require Kohler to show a likelihood of significant harm. Yet it offers only the presumption that it will be harmed.

Although the public has an interest in avoiding confusion, if confusion were to occur Kohler has not shown that the degree of harm that it stands to suffer during the pendency of this lawsuit is any more than slight. Similarly, the potential injury to Whistling Oak appears to be minimal.

The outcome of Kohler's motion comes down to the fact that "[a] preliminary injunction is a very serious remedy, 'never to be indulged in except in a case clearly demanding it.'" *Barbecue Marx*, 235 F.3d at 1044 (quoting *Schwinn Bicycle Co. v. Ross Bicycles, Inc.*, 870 F.2d 1176, 1181 (7th Cir. 1989)). Faced with risks of minimal harm on all sides of the balance, and Kohler having demonstrated not much more than a negligible chance of success on its infringement claim (the court offers no assessment of the likelihood of Kohler prevailing on any of its other claims), Kohler's motion for a preliminary injunction must be denied. Slight risks of minimal injuries do not clearly demand the extraordinary relief of a preliminary injunction.

Finally, the slight risks of injury can be mitigated by promptly scheduling this matter for trial. Notwithstanding the backlog of trials that has developed in this district from the pandemic, this court, unencumbered by criminal trials, can accommodate a prompt trial if the parties seek it.

**IT IS THEREFORE ORDERED** that Kohler's motion for a preliminary injunction (ECF No. 47) is **denied**.

**IT IS FURTHER ORDERED** that Whistling Oak's motion to file a supplemental declaration (ECF No. 80) is **granted**.

Dated at Milwaukee, Wisconsin this 14th day of June, 2021.

_William E. Duffin_
WILLIAM E. DUFFIN
U.S. Magistrate Judge